```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF MISSOURI
                        EASTERN DIVISION

ELIZABETH HENDERSON,            )
                                )
          Plaintiff,            )
                                )
     v.                         )     No. 4:11 CV 1826 DDN
                                )
MICHAEL J. ASTRUE,              )
Commissioner of Social Security,)
                                )
          Defendant.            )
```

**MEMORANDUM**

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Elizabeth Henderson for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, et seq. and for supplemental security income under Title XVI, 42 U.S.C. § 1381, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the court affirms the decision of the Administrative Law Judge (ALJ).

**I. BACKGROUND**

In February 2010 plaintiff filed her applications, alleging she became disabled on April 9, 2009 when she was 42 years old due to depression, panic disorder, chronic obstructive pulmonary disorder (COPD), emphysema, and bipolar manic depressive disorder. (Tr. 8, 19, 104-17, 135.) Her claims were denied initially and after a hearing before an ALJ. (Tr. 8-20, 50-52, 61-67.) On September 16, 2011, the Appeals Council denied plaintiff's request for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

**II. MEDICAL AND OTHER HISTORY**

Plaintiff completed some high school and has a GED. She has past work as a cashier, harvest worker, and receptionist. (Tr. 18-19, 137.)

On February 25, 2009, plaintiff saw Jyothi Mandava, M.D., a psychiatrist, for an initial evaluation. Dr. Mandava noted that she had

last seen plaintiff two years earlier. Plaintiff had a history of crack cocaine abuse. Plaintiff complained that she was easily agitated, depressed, stayed in bed all day and did not leave her home, did not like or get along with others, could not hold a job, and panicked when meeting people. Dr. Mandava diagnosed bipolar-depression and cocaine abuse. She assigned a Global Assessment of Functioning (GAF) score of 55,[1] indicating moderate symptoms. Plaintiff was not taking any prescription medication. Dr. Mandava prescribed Lexapro, an antidepressant, and Topamax, an anti-seizure medication also used to treat bipolar disorder. (Tr. 317-18.)

On March 17, 2009, plaintiff saw Matthew Beckerdite, M.D., with complaints of fatigue. She reported that she was struggling to carry out day-to-day responsibilities. Dr. Beckerdite diagnosed malaise and fatigue and ordered blood work. (Tr. 265.)

Plaintiff saw Dr. Mandava on April 9, 2009. She was currently depressed. She stayed in bed, and had diminished energy, motivation, and interest. She was overweight. Plaintiff stated that she did not like or get along with people, could not hold down a job, and panicked when meeting people. (Tr. 316-17.) In a short letter, Dr. Mandava opined in three sentences, without underlying data, that plaintiff was psychiatrically unstable, that she was disabled for the next twelve months, and that she was homebound due to her symptoms. (Tr. 276.)

On April 1, 2010, plaintiff saw Dr. Mandava. Dr. Mandava noted that she had not seen plaintiff since April 9, 2009 and that plaintiff had not been on medication for the past 10 months because she had lost her health insurance. Plaintiff was depressed and reported that she had not left her bedroom all winter. She had had a severe panic attack a few weeks earlier and was seen in the emergency room. Her GAF score was 50, indicating serious symptoms. Dr. Mandava prescribed Lexapro and Topamax.

On April 30, 2010, plaintiff saw Dr. Mandava with complaints of panic attacks and difficulty breathing. Dr. Mandava increased her

---

[1]A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components. <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 32-34 (4th ed. 2000).

Lexapro. (Tr. 314-15.)

She saw Dr. Mandava on June 8, 2010. She was not having panic attacks and was still a "little depressed" and sometimes had mood fluctuations. She was losing her Medicaid coverage and had applied for disability benefits. She was getting married in four days. Dr. Mandava changed her Lexapro to a prescription for Celexa, another antidepressant. (Tr. 468.)

On June 10, 2010, medical consultant Marsha Toll, PsyD, completed a Psychiatric Review Technique Form. Dr. Toll opined that plaintiff had moderate restriction of activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace, and no episodes of decompensation. Dr. Toll concluded that there was insufficient evidence to make a decision on plaintiff's claim for Title II benefits because there was no medical evidence of record on mental health complaints from April 2009 to April 2010. Dr. Toll opined that plaintiff's mental health had improved since she returned to treatment and was taking medication. She also found plaintiff not credible because the extremes noted in plaintiff's function report were inconsistent with the evidence in the file. (Tr. 320-31.)

Dr. Toll also completed a Mental RFC Assessment. She concluded that plaintiff had no "marked" limitations, but had "moderate" limitations in her ability to carry out detailed instructions; her ability to maintain attention and concentration for extended periods; her ability to work in coordination with or proximity to others without being distracted by them; and her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform work at a consistent pace without a reasonable number and length of rest periods. With respect to social interaction, she had moderate limitations in her ability to interact appropriately with the general public; her ability to accept instructions and respond appropriately to criticism from supervisors; and her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. With respect to adaptation, she had marked limitation in her ability to respond appropriately to changes in the work setting.

Dr. Toll concluded plaintiff retained the ability to perform simple

work and make simple work related decisions. Due to plaintiff's panic disorder in response to interactions with others, she should avoid work environments that required close and intense relationships. (Tr. 332-34.)

August 25, 2010 records from plaintiff's primary care provider, Volunteers in Medicine, state that plaintiff had "good control" with Lexapro and Topamax. She had quit smoking, but had smoked heavily for over 30 years. (Tr. 16, 527-36.)

On May 5, 2011, plaintiff saw David A. Lipsitz, Ph.D., clinical psychologist, for a psychological and intellectual evaluation. Plaintiff reported that she was diagnosed with bipolar disorder in 1996 after a violent rape. Since that time, she has had extreme flashbacks and nightmares. She is paranoid and checks her windows and doors constantly. She has had bad mood swings, described as more homicidal than suicidal. Plaintiff stated that she was depressed all the time and lived in her bedroom. She reported that her panic disorder seemed to be under control and that while medication helps, it seems to wear off after several months. (Tr. 533-36.)

Plaintiff had a full scale IQ of 71. Test scores were below average, suggesting deficient cognitive functioning. Dr. Lipsitz opined that plaintiff's IQ placed her in the lower part of "borderline" range. Dr. Lipsitz diagnosed recurrent major depression with panic attacks and PTSD. Her GAF score was 47, indicating serious symptoms. Dr. Lipsitz opined that plaintiff was in need of ongoing psychiatric treatment combining medication and individual psychotherapy. (Tr. 533-36.)

**Testimony at the Hearing**

On May 11, 2011, plaintiff appeared and testified to the following at a hearing before an ALJ. (Tr. 21-49.) She is 44 years old and lives in a mobile home with her husband and two children. She is unable to drive due to her panic attacks. (Tr. 21-27, 38.)

She last worked at a temporary agency in 2008 doing harvesting work, driving vehicles, and moving papers. She also worked as an intake worker at the Salvation Army and as a cashier. She could not maintain these jobs because she is not mentally stable. Her COPD prevents her

from working in dusty or perfume laden places.  She can mow her small lawn although it requires five or six hours to do so.  (Tr. 26-35.)

She is able to walk around a grocery store, sit without difficulty, and climb a flight of stairs.  She has problems with memory.  She has panic attacks two or three times per week.  She sits in her bedroom all day, watching TV and cleaning her room.  She can dust, vacuum, wash walls, and rearrange her closet and drawers.  She sometimes cooks meals. (Tr. 36-40.)

She no longer sees Dr. Mandava because she does not receive Medicaid and has no money.  She has crying spells a couple of times per week.  She is not sure what triggers them, although she does not have a happy marriage.  (Tr. 40-41.)

Vocational Expert (VE) Gary Wiemholt also testified at the hearing. Plaintiff has prior relevant work (PRW) as an unskilled entry level cashier, classified as light; fruit harvest worker, classified as light and medium; as well as temporary jobs, including production worker, classified as light and unskilled.  (Tr. 42-45.)

The ALJ posed hypothetical questions to the VE.  The first described a hypothetical person with plaintiff's age, education,  and PRW who was capable of performing light work, but who was limited to performing simple, repetitive tasks and can only have occasional contact with coworkers, supervisors, and the public, and no transactional interaction with the public.  The VE testified that plaintiff could perform her past jobs such as production assembler and production worker.  (Tr. 45-46.)

In the second hypothetical, the ALJ assumed the same limitations as the first, except that the individual was limited to performing sedentary instead of light work.  The VE testified that such an individual would be unable to perform plaintiff's PRW.  The VE testified that some similar type jobs would be available, for example, packaging pharmaceuticals or other small plastic items, as well as small part assembly jobs.  (Tr. 46.)

In a third hypothetical, the ALJ assumed the same hypothetical person as described in the second question, except that the individual would need to elevate her leg up to 24 inches from the floor for two hours at least once per week.  The VE testified that the same sedentary

jobs would be available even if the individual needed to elevate a leg up to two hours twice per week. (Tr. 46-47.)

In a fourth hypothetical the ALJ assumed all of the limitations as the second, except that the individual would be off work once a week due to medical issues such as panic attacks. The VE testified that such an individual would not be able to perform any of the previously mentioned jobs. (Tr. 47-48.)

On examination by plaintiff's counsel, the VE assumed the same limitations as the first hypothetical with the added limitation that the individual was not able to maintain concentration, persistence, and pace for 75 to 80 percent of the time or longer due to pain or mental issues. The VE testified that there would be no jobs that such an individual could perform. Counsel asked a second question assuming the same limitations as the second hypothetical, as well as requiring elevating the leg on a daily basis or taking more than two scheduled breaks to address pain. The VE testified that there would be no jobs available that such an individual could perform. (Tr. 47-48.)

### III. DECISION OF THE ALJ

On June 16, 2011, the ALJ issued a decision unfavorable to the plaintiff. (Tr. 8-20.) The ALJ found that plaintiff had not performed substantial gainful activity since April 9, 2009, her alleged onset date. The ALJ found that plaintiff had the severe impairments of depression, anxiety, bipolar disorder, PTSD, emphysema, borderline intellectual functioning, and panic disorder. The ALJ found that plaintiff did not suffer from an impairment or combination of impairments of a severity that meets or medically equals the required severity of a listed impairment. (Tr. 10-15.)

The ALJ found that plaintiff had the RFC to perform light work, with the limitation that it not require more than occasional contact with coworkers, supervisors, and the public. The ALJ found that plaintiff's subjective complaints were not credible to the extent that they conflicted with the ALJ's RFC assessment. (Tr. 15-16.)

The ALJ found that plaintiff's RFC precluded her from performing her PRW, but that there were other jobs available in the national economy

that she could perform.  Therefore, the ALJ found that plaintiff was not disabled.  (Tr. 18-20.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's final decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009).  A five-step regulatory framework is used to determine whether an individual qualifies for disability.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  Pate-Fires, 564 F.3d at 942.  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.  Id.  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform

her PRW.  Id.  The claimant bears the burden of demonstrating she is no longer able to return to his PRW.  Id.  If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

### V. DISCUSSION

Plaintiff argues the ALJ erred in failing to give proper weight to the opinion of her treating psychiatrist and in failing to recontact her treating medical care provider.

**1.   Opinion of Treating Psychiatrist Dr. Jyothi Mandava**

Plaintiff argues that the ALJ should have given greater weight to treating psychiatrist Dr. Mandava's opinion.  She contends that Dr. Mandava's opinion is consistent with her lengthy course of treatment and her complaints to her healthcare providers.  The court disagrees.

The ALJ is required to assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012).  A treating physician's opinion is generally given controlling weight, but is not inherently entitled to it.  Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006).  See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  An ALJ may elect under certain circumstances not to give controlling weight to treating doctors' opinions.  A physician's statement that is not supported by diagnoses based on objective evidence will not support a finding of disability.  Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003).

The regulations specify the factors that the ALJ must consider when determining the weight to assign to a medical opinion.  20 C.F.R. §§ 404.1527(c), 416.927(c).  The ALJ must consider whether the medical source treated or examined the claimant, the length of the treatment relationship, if any, the source's area of medical specialization, the extent to which  the opinion was supported by objective medical evidence, whether it was consistent with other evidence of record, and "other

factors." Id. In addition, a statement by a medical source that a claimant is "disabled" or "unable to work" is not a "medical opinion" but an issue reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(d), 416.927(d).

In this case, Dr. Mandava opined that plaintiff was psychiatrically unstable, that she was disabled for the next twelve months, and that she was homebound due to her symptoms. The ALJ found the veracity of Dr. Mandava's statement questionable and declined to accept it.

The ALJ did not err in declining to give Dr. Mandava's opinion controlling weight. The ALJ discounted Dr. Mandava's opinion, in part, noting that plaintiff saw Dr. Mandava on only four occasions between February 2009 and April 2010. (Tr. 18, 314-15, 317-18.) While the ALJ acknowledged that plaintiff's lack of Medicaid coverage may have played a role in limiting the amount of treatment she received, the ALJ also noted that the record evidence demonstrated that when plaintiff did have Medicaid coverage, she did not seek care, calling into question the severity of her condition, as well as her motivation. (Tr. 18.)

Dr. Mandava's own records also do not support her opinion that plaintiff was disabled and housebound. At plaintiff's February 25, 2009 office visit, Dr. Mandava noted that plaintiff had last seen her two years earlier. She diagnosed bipolar-depression and cocaine abuse, and assigned a GAF score of 55. Plaintiff was not currently taking medication, and Dr. Mandava prescribed Lexapro and Topamax. (Tr. 317-19.)

At plaintiff's April 1, 2010 visit, Dr. Mandava noted that she had not seen plaintiff in a year. Plaintiff had not been taking medication for the past 10 months because she no longer had health insurance. She restarted plaintiff on Lexapro and Topamax. On April 30, 2010, plaintiff saw Dr. Mandava again with complaints of panic attacks and difficulty breathing. Dr. Mandava increased plaintiff's Lexapro. By June 2010, she was not having panic attacks, was still a "little depressed," and was getting married shortly. (Tr. 314-15, 468.)

Dr. Mandava's opinion is also inconsistent with the record as a whole. An ALJ may discount, or completely reject, the opinion of a treating physician if it is inconsistent with the record as a whole. See

-9-

McCoy v. Astrue, 648 F.3d 605, 616 (8th Cir. 2011). The ALJ specifically noted that there was no support in the record evidence for Dr. Mandava's opinion that plaintiff was homebound due to her symptoms. (Tr. 18, 276, 314-18, 465-68.)

Dr. Mandava's opinion is also inconsistent with Dr. Toll's opinion that plaintiff had moderate restriction of activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace, and no episodes of decompensation. Dr. Toll also opined that plaintiff's mental health had improved since she returned to treatment and assessed a GAF score of 60. Dr Toll found plaintiff not credible because the extremes plaintiff described in her function report did not correspond with the information in her file. (Tr. 320-31.)

Dr. Mandava's opinion is also inconsistent with Dr. Toll's Mental RFC Assessment that plaintiff had no marked limitations but had moderate limitations in multiple categories. Dr. Toll opined that the cumulative effect of plaintiff's limitations would restrict her to performing simple work and that she could make simple work related decisions. He opined that due to plaintiff's panic disorder in response to interactions with others, she should avoid work environments that require close and intense relationships with others. (Tr. 320-34.)

Finally, nothing in Dr. Lipsitz's report suggests that plaintiff had greater limitations than those set forth by the ALJ in his RFC determination. Significantly, Dr. Lipsitz did not opine as to plaintiff's RFC. He did, however, highlight plaintiff's need for ongoing psychological treatment combining medication with individual therapy. (Tr. 533-36.) Dr. Lipsitz's report supports the ALJ's conclusion that plaintiff's mental disorders were under good control when she was compliant with medication. It is also consistent with records from Volunteers in Medicine which state that plaintiff had "good control" on medication. (Tr. 16, 527-36.)

The ALJ also properly gave no weight to Dr. Mandava's opinion that plaintiff was disabled. See House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007) ("treating physician's opinion that a claimant is disabled or cannot be gainfully employed receives no deference because it invades the

province of the Commissioner to make the ultimate disability determination").

The court concludes that substantial evidence supports the ALJ's finding that Dr. Mandava's opinion was not entitled to the weight ordinarily accorded that of a treating source.

## 2.  **Failure to Recontact Treating Physician**

Plaintiff next argues that the ALJ erred in failing to recontact her treating physician. Although plaintiff does not identify the doctor to whom she is referring, the court will assume plaintiff is referring to Dr. Mandava.

An ALJ has a duty to fully develop the record, even when the claimant is represented by an attorney. Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004). An ALJ should recontact a treating or consulting physician if a critical issue is undeveloped. See Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). The ALJ is not required to recontact any physician whenever he rejects that physician's opinion. See Hacker v. Barnhart, 459 F.3d 934, 938 (8th Cir. 2006). "The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994).

Plaintiff does not state how recontacting Dr. Mandava--or any other medical source--would assist her case. Nor does she state what critical issue is undeveloped. Because the record evidence as presently constituted provides a sufficient basis for the ALJ's decision, the court finds no error.

## III.  CONCLUSION

For the reasons set forth above, the court finds that the decision of the ALJ is supported by substantial evidence in the record as a whole and is consistent with the applicable law.  The decision of the Commissioner of Social Security is affirmed.

An appropriate Judgment Order is issued herewith.


　　　　　　　　　　　　　　　　　　／S／　　David D. Noce　　　
　　　　　　　　　　　　　　　　　　**UNITED STATES MAGISTRATE JUDGE**


**Signed on January 16, 2013.**